E-FILED
Tuesday, 20 August, 2024  01:10:36 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| TIMMOTHY CARLTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 24-cv-1293 |
| | ) | |
| CITY OF BLOOMINGTON, | ) | |
| JAMAL SIMINGTON, CHAD | ) | |
| WAMSLEY and PAUL WILLIAMS, | ) | |
| all individually and in their official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff, TIMMOTHY CARLTON ("Carlton"), by and through his attorney, JULIE L. GALASSI, BRYANT S. LOWE AND HASSELBERG, ROCK, BELL & KUPPLER, LLP, in support of his Complaint states as follows:

### Nature of the Action

1.     Defendants terminated Carlton because he spoke out in advocacy of the police department's union members and as to matters of public concern involving an order to pull over motorists on the basis of their race.

2.     Defendants refused to provide Carlton with the evidence they utilized to terminate him, refused to consider Carlton's evidence supporting his defense and failed to afford Carlton due process before depriving him of his property interest in his job.

1

3.     Defendants' termination of Carlton violated 42 U.S.C. 1983, because, while acting under the color of law, Defendants retaliated against Carlton for exercising his right of free speech secured under the First Amendment of the United States Constitution.

4.     Defendants' termination of Carlton also violated Illinois common law because it is against public policy to terminate an employee for reporting illegal conduct.

## Parties

5.     Plaintiff, Timmothy Carlton ("Carlton"), resides in Lee County, Florida. During the events giving rise to Carlton's claims, Carlton, resided in McLean County, Illinois.

6.     Defendant, City of Bloomington ("Bloomington"), is located in McLean County, Illinois.

7.     Defendants, Jamal Simington ("Simington"), Chad Wamsley ("Wamsley") and Paul Williams ("Williams") reside in McLean County, Illinois.

## JURISDICTION AND VENUE

8.     This court has subject matter jurisdiction over Counts I, II and IV pursuant to 42 U.S.C. §1983.

9.     This Court has subject matter jurisdiction over Count III of this matter pursuant to 28 U.S.C. 1367, because it is part of the same case or controversy raised in Count I, II and IV.

10.    The Central District of Illinois is the proper venue for this matter pursuant to 28 U.S.C. 139(b)(1) and (2), because the Defendants reside in McLean County and the events giving rise to Plaintiff's claims occurred in the Central District of Illinois, Peoria Division.

## FACTUAL ALLEGATIONS

### Carlton's Speech is the catalyst for his termination.

11.    At the time giving rise to this complaint, Carlton had served as a police officer for twenty-two years and was the most decorated police officer for the City of Bloomington Police Department. Carlton was terminated from his employment on January 30, 2024. Carlton held the rank of Sergeant at the time of his termination.

12.    At all relevant times, Simington was the Chief of Police for the City of Bloomington Police Department, and Wamsley and Williams were the Assistant Chiefs of Police for the City of Bloomington.

13.    Simington, Wamsley and Williams' positions are the highest supervisory and/or managerial position in the administrative hierarchy of the Bloomington Police Department.

14.    The Chief's office supervised, managed and controlled the daily overall operations, policies and procedures and the terms and conditions of Carlton's employment.

15.     Prior to December 2022, Simington and Carlton spoke on a regular basis, had lunch together and seemed to have enjoyed a cordial relationship.

16.    Carlton had been on the union board since 2010. As late as 2022, his advocacy of the union was met with hostility and disparate treatment.

### Carlton advocates for the union.

17.    In November of 2022, Carlton attended a mandatory supervisor meeting in Skokie, Illinois along with approximately 30 other supervisors, including Simington, the assistant Chiefs, Wamsley and Williams, six lieutenants and 16 sergeants. During a meeting, Simington lauded the supervisors as gatekeepers of the force and spoke of the exemplary job they all performed. Simington asked for input on any issue at the Police Department and how the department was operating under his command.

18.    At the time of the Skokie meeting, the police department union had been operating for nearly two years without a contract. The impasse between the union and Bloomington centered on increased pay and benefits for nearly 120 police officers.

19.    After Simington sang the praises of Police Department supervisors, Carlton spoke out to Simington stating, in effect, "then why can't you pay us what we are owed and stand up for us" in reference to the union contract.

### Carlton's reporting of illegal conduct.

20.    Sometime in January 2023, Simington became concerned about the department's breakdown of minority traffic stops compared to white driver traffic stops.

4

21.     To avoid the potential accusation that the BPD was engaged in racial profiling, Simington and Williams issued an order for officers to make more traffic stops of white individuals.

22.     Carlton spoke out against the order to his superior and advised officers that the order was illegal. Motorists should only be pulled over for violations of the motor vehicle code – not because of race. Carlton was told to get in line with what the Chief wanted.

23.     In August 2023, the "pull more white people over" order was reiterated in an email to BPD lieutenants who had not raised any objection to the order. Carlton again spoke out about the illegality of following the order.

24.     Following BPD's receipt of a FOIA for the August 2023 email, that was traced back to Carlton, Assistant Chief Williams told a group of Lieutenants and one Sergeant that he was going to make life hell for the person behind the FOIA request.

## The fall out from Carlton's pro-union conduct and statements condemning the "Pull more white people over" order.

25.     Immediately following the Skokie meeting, Simington's demeanor and behavior toward Carlton changed for the worse.

26.     Simington refused to look at Carlton and did not speak to him again for the next 13 months except on two occasions when, as Chief, he was required to present Carlton with two decorations Carlton had earned.

5

27. Carlton had been warned that upper command would come after him after his comments at the supervisor's retreat.

28. Over the next several months after Carlton's Skokie statement and statements about the illegal order to increase vehicle stops of white drivers, Carlton was disciplined twice for miscounting or undercounting money on third shift. Carlton was one of many officers who seized monies and participated in money counts. The officers had no money counter available so miscounts were routine. Upon information and belief, Carlton is the only Bloomington Police Department officer disciplined for having a $2.00 and $20.00 miscount.

29. Carlton was written up for not performing his duties, which was false. Carlton was told to assist two officers who could not get along, when he had the time. His write up was supposedly based on failing to complete the two officers' work. Carlton was not told what he had supposedly done wrong or given a chance to tell his side of the issue. Carlton only learned of the write-up after finding it on the Department's IE PRo computer file.

30. Carlton was disciplined for wearing a T-shirt to workout that the Chiefs falsely claimed was offensive.

31. Carlton had an Active Shooter class certified through the Illinois Law Enforcement Training Board ("ILETSB"). Carlton had been the Lead Instructor for 10 years. The Chiefs twice tried to take the class away from Carlton claiming he was not teaching the correct substance. Each time, Carlton had proof showing he

6

was using the correct instruction which was affirmed by the Mobile Training Unit ("MTU 8").

32.     Following Carlton's return to work from a work-related injury, he prepared to teach the Active Shooter course. Through the Chief's office, Carlton was informed that he was not going to teach the Active Shooter course anymore and that he needed to concentrate on working his shift. Carlton's performance on shift did not show he lacked concentration toward any of his assigned duties. The leaders of MTU 8 told the Chief's office, that if Carlton was not going to provide the class instruction, MTU 8 would cancel the class. The entity setting the standards for teaching Active Shooter classes clearly determined Carlton was teaching the proper substance required.

33.     In 2023, when Carlton was last scheduled to take the Active Shooter Instructor class one week and then teach the second week, the Chief's office told him that he was no longer going to be allowed to teach, but would be kept on the instructors list. At this point, Carlton said he would resign as an instructor because Active Shooter instructors need to stay informed on the latest crime trends and how to respond to these changes. This requires an instructor to teach every three months or so, to ensure the latest techniques and training hours are addressed.

34.     Carlton was a member of the BPD Swat Team. Carlton had been on the team for 9 ½ years. During a Swat Team callout in 2022 to arrest a homicide suspect, the suspect drove away in a car. Following a pursuit by unmarked surveillance officers, the team located the suspect at a gas station. While exiting the

7

Swat truck, Carlton unholstered his gun and after doing so, the light on his handgun started to come apart. While trying to fix the light, Carlton's gun accidentally discharged.

35.    The usual protocol for accidental discharges incidents was to have a debrief and review the pertinent videos and assess the situation. Ignoring protocol, the Chief's office requested the Illinois State Police investigate Carlton for potential criminal charges. The Illinois State Police cleared Carlton of all potential charges. The Chief's office then opened an internal affairs investigation the result of which was a one-day suspension. Carlton resigned from the Swat team fearing future adverse actions from the Chief's office.

**Carlton's eventual termination was based on the false claims that Carlton was in cahoots with criminals and betrayed his oath to the badge.**

36.    Carlton's wife, Wendy Carlton ("Wendy"), had worked on and off for a Dr. Allen over the past few decades as a Registered Nurse and one time as Certified Registered Nurse Anesthetist. After providing anesthesia for Dr. Allen one time in January 2023, Wendy told Carlton that she felt that it was not safe for her to work there. Wendy said the narcotics were expired and that Dr. Allen was using outdated materials in the operating room. Wendy said other office staff also brought to her attention criminal matters taking place at Dr. Allen's office.

37.    Not long after Wendy provided Carlton with information about issues at Dr. Allen's office, a police service call was made to the BPD regarding Dr. Allen.

Though Carlton was not on scene for the call, he was on duty and in charge of the desk which required Carlton to assist officers in whatever capacity was needed. Officer Demoss relayed to Carlton that Dr. Allen had set his house on fire because he thought "they were coming for him.…"

38.     Sometime after the fire at Dr. Allen's house, Wendy informed Carlton that nurses at Dr. Allen's office, Jadeyn and Cassandra Lacey, had filed a report against Tandy Chazar, who worked with Dr. Allen, and Dr. Allen himself, to the Drug Enforcement Agency and the Illinois Department of Financial and Professional Regulations. Before doing so, they photographed all Dr. Allen's drug supply, logbook, and outdated supplies. The Lacey's complaint alleged the very same issues Wendy had told Carlton about a few months earlier.

39.     Wendy did not have any personal or professional working relationship with the Laceys other than her CRNA assignment in January 2023. Carlton had no personal relationship with the Laceys and certainly neither Carlton or Wendy considered the Laceys social friends.

40.     Jadeyn and Cassandra Lacey left Dr. Allen's office to work at Blueze Wellness under Dr. Nilles. During the next few months, Jadeyn and Cassandra Lacey texted Wendy multiple times about the continued issues with Dr. Allen and Tandy Chazar. The Laceys said they were being harassed by Tandy Chazar and heard that she filed a false police report about them.

41.    In May 2023, Wendy received a text from Jadeyn that someone at Dr. Allen's office said the police were there. Due to the Carltons' past relationship with Dr. Allen and the hostility between Dr. Allen's office and the Laceys, Carlton called and spoke with Sergeant Shumaker to ensure everything was safe. After speaking with Sergeant Shumaker, Carlton relayed to Wendy that everything was fine and why the police were at Dr. Allen's office.

42.    In May 2023, Jadeyn Lacey texted Wendy and told her another BPD officer had given a copy of Tandy's false police report to Chantel Webb, a part owner of Blueze Wellness, who then shared it with Lacey. The report had been filed by Tandy Chazar against Jadeyn and Cassandra Lacey claiming they stole narcotics and narcotic drug log sheets from Dr. Allen's office.

43.    Jadeyn Lacey reached out to Wendy several times, stating that he called the detective assigned to the case, but that detective was not getting back to him. Jadeyn Lacey also stated that he had several messages, pictures, and a video from an individual, who at Tandy Chazar's request, hid narcotics and a logbook in her car trunk when the Illinois Department of Professional Regulation showed up at Dr. Allen's office in addition to other criminal matters involving Dr. Allen.

44.    Based on all the information that Wendy had provided Carlton, he looked up the two reports involving Dr. Allen and the Laceys. Carlton reviewed the reports to gain a perspective of the case to compare with the evidence he had been presented with by three different sources. Carlton printed the two reports to take home so he could review them after he had slept.

10

45. Carlton asked Wendy to have Jadeyn Lacey send Carlton any evidence to back up the information he had provided Wendy. Carlton then reviewed the evidence in light of the reports. After reviewing Jadeyn Lacey's evidence, Carlton determined that Jadeyn Lacey's evidence was credible, and it backed up their version of events regarding Dr. Allen's practice and Tandy's illegal conduct. It was at this time, Carlton felt Jadeyn and Cassandra Lacey were likely witnesses to a crime, and even possibly victims of someone filing a false report against them.

46. Jadeyn and Cassandra Lacey asked Carlton and Wendy to come and speak with them in person because they were not able to get anyone from BPD to come talk with them. Carlton was willing to go in order to see if the Laceys' verbal recollection of events was similar to their evidence. Carlton spoke with the Laceys for a few minutes – his only personal contact with the Laceys.

47. Unbeknownst to Carlton until September or October 2023, Wendy had taken a picture of one of the reports and sent it to Jadeyn Lacey. Jadeyn Lacey said that it was the same report another BPD officer had already sent them earlier in the year.

48. After Carlton went and listened to the Laceys' version of events, Carlton promised to put them in contact with the assigned detective. Carlton also received credible information from Lorreen Nettingham, a former employee of Dr. Allen, that she had made copies of fraudulent activities by Tandy Chazar and Dr. Allen, when she worked at their office. Nettingham claimed she also saw the missing logbook for narcotics, which corroborated what the Laceys had previously

told Carlton. After Carlton's short exchange with the Laceys, he had to attend to his children and went to his car and waited for Wendy. Without his knowledge Wendy left the Laceys with the two police reports.

49.     Carlton spoke with Detective Sergeant Bierbaum and said he had information and evidence on the Dr. Allen case and asked who the case agent was. Sergeant Bierbaum told Carlton Detective Raisbeck was the case agent. Carlton texted and called Detective Raisbeck after Sergeant Bierbaum advised the information should go to him as lead investigator. When Carlton called Detective Raisbeck, he learned Reisbeck was on vacation. Carlton told Raisbeck everything that the Laceys had told Carlton, as well as about all of the evidence the Laceys possessed. Detective Raisbeck said he planned to talk to the Laceys when he returned home from vacation. Carlton then sent Jadeyn and Cassandra's phone contact to Detective Raisbeck per his request.

50.     A few days later, Jadeyn Lacey told Wendy that one of the main witnesses, Tricia Desmond, was getting cold feet due to being harassed by Tandy Chazar. Knowing that Detective Raisbeck was on vacation, Carlton reached out to Sergeant Bierbaum and asked if one of his detectives could talk to her and explained the circumstances. Sergeant Bierbaum asked Carlton to send the witnesses contact information to him and he would have Detective Diaz speak with her.

51.     After Detective Diaz finished speaking with Tricia Desmond, Carlton reached out to ask how things went. Once Detective Raisbeck got back from

vacation Carlton contacted him and asked how the investigation was going. Carlton was told Raisbeck had to push the Lacey case back due to a homicide case.

52.     Detective Raisbeck finally spoke with the Laceys and contacted Carlton several times to discuss other elements of the investigation. Detective Raisbeck said he did not see the Laceys as suspects in the case. Raisbeck also told Carlton he was working with the DEA on the case against Dr. Allen. Raisebeck confirmed to Carlton that he was told by Sergeant Bierbaum that Raisbeck could communicate with Carlton on this case as Carlton was able to help give information.

53.     Sometime after Carlton's conversation with Raisbeck, Carlton was notified that Officer Steck wanted to speak with the Laceys about another report made by Tandy Chazar. Carlton was aware that Officer Steck was a brand-new officer on solo patrol, following an elongated field training process for several inefficiencies in performing the job. Due to this, Carlton reached out to him to let him know the 'big picture' of what was going on between the Laceys and Dr. Allen's office. Other than relating the pertinent facts, Carlton did not discuss how Steck should proceed or conduct the investigation.

54.     In reporting the information to other officers, Carlton had been assured that the Laceys were not suspects as a result of Chazar's allegations.

55.     In June 2023, Carlton ran into Chuck Casagrande, a Bloomington Fire Captain, at church and began talking. Based on Dr. Allen's possible criminal acts of

insurance fraud and arson, Carlton asked Casagrande if he knew anything about the Dr. Allen arson case. Casagrande told Carlton who the arson investigators were and that Dr. Allen told investigators and nursing staff at the hospital that he set the fire to his house. Casagrande said there was evidence proving Dr. Allen set the fire as well as his testimony admitting he had done so.

<u>The Laceys become criminal suspects in matters unrelated to the issues at</u>

<u>Dr. Allen's office.</u>

56.     In July 2023, Dr. Nilles called Carlton and told him that he had proof that Jadeyn and Cassandra Lacey had stolen tens of thousands of dollars from his clinic. Dr. Nilles said he was going to try and negotiate with the Laceys to get the money returned but if not, he would be filing a police report against them. A few days later, Dr. Nilles called Carlton back and asked for the Laceys to be arrested and wanted to report the theft. Carlton was then serving as a dayshift Sergeant. Carlton asked Officer Widmer to go to Blueze Wellness to take the report from Dr. Nilles and his co-owner Chantel Webb and if Widmer established probable cause to make the arrest. Officer Widmer took the report and came back to BPD to speak with Carlton about the allegations. Officer Widmer said he had probable cause for the Laceys' arrest. Carlton told him to take another officer with him and make the arrest. Carlton had no contact with the Laceys about the theft from Dr. Nilles.

57.     On September 1, 2023, Carlton was brought into the Chief's office and told he was under investigation. An Illinois State Police criminal investigation was prompted by Chief Simington and Assistant Chief Wamsley. ISP and a Special

14

Prosecutor investigated Carlton and determined no criminal charges were to be filed.

### Carlton's Sham Loudermill hearing.

58.   On January 16, 2024, Carlton was presented with a multitude of false charges and a recommendation from Williams that he be terminated. The essence of the charges centered on policy violations stemming from Carlton's "friendship" with criminal suspects, providing them BPD police reports, attempting to steer a criminal investigation away from the Laceys and impeding a criminal investigation.

59.   On January 16, 2024, Williams advised Carlton that he would have the opportunity to respond to the charges so he could present points of disagreement, identify witnesses who might support his defense, identify any mitigating circumstances which should be considered and offer any arguments.

60.   Sections 5.4(k) and (l) of the pertinent Collective Bargaining Agreement required the City to provide Carlton of all exculpatory evidence within a reasonable time of its discovery by the person conducting the investigation. Wamsley did not do so. The City was to notify Carlton's union of any books, papers, documents, charts, logs, memoranda, photographs or tangible objects the City intends to use in the discipline hearing. The City refused to do so.

61.   Two days before the charges were filed by Williams, Wamsley and Sargeant Lynn interviewed Chantel Webb. Instead of discussing the Laceys' theft of funds from Dr. Nilles, Chantel's business partner, Wamsley or Lynn turned off the

recording device and turned the conversation to Carlton providing reports to the Laceys. Webb corrected Wamsley and said it was Wendy who gave the reports to the Laceys, not Carlton. Wamsley's response was that Carlton gave cops a bad name.

62.    A Loudermill hearing was held on January 26, 2024, over the charges. The hearing lasted approximately 15 minutes.

63.    The defendants used personal communications between Carlton and Wendy, in violation of Carlton's marital communication privilege.

64.    After the charges were filed and prior to the termination hearing, Carlton was not provided the majority of evidence used by his superiors to justify his termination nor any exculpatory evidence such as Chantel Webb's statement. The evidence withheld consisted of witness statements and recordings, video statements, photographs, phone records and investigative reports.

65.    In his defense, Carlton had submitted numerous texts which established the falsity of the charges and evidence in support of same.

66.    On January 26, 2024, Carlton requested the communications he submitted be reviewed. Carlton was told the hearing was not "the platform" to review the communications.

67.    On January 26, 2024, Carlton attempted to read his statement about his denial of the charges, and he was cut off half way through the statement.

68.    Following the hearing, the union requested for a second time a copy of the Internal Affairs file. To date, the City has not provided a complete copy.

69.    On January 30, 2024, Carlton received written notice that the charges against him had been sustained and his employment was terminated by Simington and HR Director Albertson.

70.    Carlton's job performance was more than satisfactory, and he consistently met his employer's legitimate job expectations.

71.    Similarly situated police officers, not exercising their free speech rights, were treated more favorably than Carlton.

## COUNT I

## 42 U.S.C. 1983

## VIOLATION OF CARLTON'S FIRST AMENDMENT RIGHT TO FREE SPEECH ABOUT RACIAL PROFILING BY ALL DEFENDANTS

72.    Carlton realleges and incorporates paragraphs 1-71 into this Count.

73.    Carlton's discussions with Defendants and other officers about policing and making traffic stops on the basis of race constitute speech protected by the First Amendment to the U.S. Constitution.

74.    Carlton has a constitutionally protected right to equal protection under the laws as guaranteed through the Fourteenth Amendment of the United States Constitution and made enforceable through 42 U.S.C. §1983.

75.    At all times, the aforementioned speech was the speech of a private citizen on a matter of public concern.

76.    Carlton's free speech right to discuss policing and racial profiling outweighed any interest of the Defendants in suppressing that speech.

77.    Defendants violated Carlton's right to free speech by terminating his employment because of his discussions about policing and racial profiling.

78.    Defendants acted intentionally and with callous disregard for Carlton's clearly established constitutional rights. Simington, Wamsley and Williams were decision makers who acted under color of state law with respect to the discriminatory treatment and decisions affecting Carlton's terms and conditions of employment.

79.    As a direct and proximate result of the Defendants' violations of Carlton's constitutional rights, Carlton has suffered severe and substantial damages. These damages include lost wages, lost employee benefits, lost raises, diminished earnings potential, lost career opportunities, litigation expenses including attorney's fees, loss of reputation, embarrassment, inconvenience, and emotional anguish and distress and other compensatory damages, in an amount to be determined by and jury and the Court.

WHEREFORE Plaintiff, Timmothy Carlton, respectfully requests that this honorable Court enter judgment in his favor and against Defendants, and grant the following relief:

A.    Judgment be entered in Carlton's favor and against the City of Bloomington, Simington, Wamsley and Williams, in their individual capacity, for his violations of 42 U.S.C. §1983;

B.    Declaratory relief regarding the unlawful and unconstitutional acts of Defendants;

C.    Equitable relief against all Defendants as allowed by 42 U.S.C. §1983, including the enjoining and permanent restraining of these violations, and direction to Defendants to take such affirmative action as is necessary to ensure that the effects of the unconstitutional and unlawful employment practices are eliminated and do not continue to affect the employment opportunities of Plaintiff or others;

D.    An award of punitive damages against the individual defendants;

E.    Reinstatement to his former full time position or an award of front pay;

F.    Reasonable attorney's fees and costs expended pursuant to 42 U.S. C. §1988; and

Such other and further relief to which Plaintiff may show himself entitled.

## COUNT II

### 42 U.S.C. 1983

### VIOLATION OF CARLTON'S FIRST AMENDMENT RIGHT TO FREE SPEECH ABOUT UNION ISSUES BY ALL DEFENDANTS

80.    Carlton realleges and incorporates paragraphs 1-71 into this Count.

81.    When Carlton advocated for the union, he was exercising his First Amendment rights under the U.S. Constitution.

82.    Simington, Wamsley and Williams were decision makers who acted under color of state law with respect to the discriminatory treatment and decisions affecting Carlton's terms and conditions of employment.

83.    Carlton has a constitutionally protected right to equal protection under the laws as guaranteed through the Fourteenth Amendment of the United States Constitution and made enforceable through 42 U.S.C. §1983.

84.    The City of Bloomington, Simington, Wamsley and Williams intentionally and willfully violated Carlton's constitutional right to equal protection under the law, in violation of 42 U.S.C. §1983 for Carlton's advocacy of the union.

85.    The individual defendants, acting under color of state law, intentionally, purposefully and willfully caused the deprivations of Carlton's constitutional rights.

86.    The individual defendants were personally involved in the discriminatory and illegal treatment of which Carlton complains.

87.    The individual defendants' actions and conduct directly and proximately cause Carlton's constitutional injuries, including emotional stress and strain, humiliation, loss of dignity, embarrassment and loss of reputation.

WHEREFORE, based on the foregoing, Timmothy Carlton prays that judgment be entered against the City of Bloomington, Simington, Wamsley and Williams, and grant the following relief:

A.  Judgment be entered in Carlton's favor and against the City of Bloomington, Simington, Wamsley and Williams, in their individual capacity, for his violations of 42 U.S.C. §1983;

B.  Declaratory relief regarding the unlawful and unconstitutional acts of Defendants;

C.  Equitable relief against all Defendants as allowed by 42 U.S.C. §1983, including the enjoining and permanent restraining of these violations, and direction to Defendants to take such affirmative action as is necessary to ensure that the effects of the unconstitutional and unlawful employment practices are eliminated and do not continue to affect the employment opportunities of Plaintiff or others;

D.  An award of punitive damages against the individual defendants;

E.  Reinstatement to his former full time position or an award of front pay;

F.  Reasonable attorney's fees and costs expended pursuant to 42 U. S. C. §1988; and

Such other and further relief to which Plaintiff may show himself entitled.

<u>COUNT III</u>

<u>Retaliatory Discharge in Violation of Illinois Law</u>
<u>by Defendant, the City of Bloomington</u>

88.    Carlton realleges and incorporates paragraphs 1-71 into this Count.

89.    Bloomington discharged Carlton because he repeatedly spoke out that the "pull more white people over" order was illegal and therefore against the public policy of the State of Illinois.

90.    20 ILCS 2715/5 provides as follows:

> "The purpose of this Act is to identify and address bias-based policing through the monitoring, review, and improvement of the collection of racial profiling information collected under the Illinois Traffic Stop Statistical Study. Through this data collection and review, a more accurate understanding of this problem can be obtained, thus allowing the concerns of the motoring public to be better addressed, resources such as specialized training to be provided, the honest efforts of Illinois' law enforcement professionals to be demonstrated, **and the civil rights of all Illinois' citizens to be protected**." (emphasis added)

91.    HB0025, the Eliminate Racial Profiling Act, provides that no law enforcement officer shall engage in racial profiling.

92.    As a direct and proximate result of Bloomington's unlawful termination of Carlton's employment in violation of a clear mandate of public policy,

Carlton has suffered severe and substantial damages. These damages include lost wages, lost employee benefits, lost raises, diminished earnings potential, lost career opportunities, loss of reputation, embarrassment, inconvenience, and emotional anguish and distress and other compensatory damages, in an amount to be determined by and jury and the Court.

WHEREFORE Plaintiff, Timmothy Carlton, respectfully requests that this Court enter judgment in his favor and against Defendant, the City of Bloomington, as follows:

A.    For appropriate compensatory damages to be determined at trial;

B.    For such other and further relief to which Plaintiff may show himself entitled.

## COUNT IV

## VIOLATION OF CARLTON'S DUE PROCESS RIGHTS BY THE CITY OF BLOOMINGTON

93.    Carlton realleges and incorporates paragraphs 1-71 into Count IV.

94.    Carlton had a property interest in his continuing employment with the Bloomington Police Department by virtue of Section 5.1(b) of the applicable Collective Bargaining Agreement which provides Carlton could only be removed from his employment for just cause.

95.    42 U.S.C. 1983 provides that:

"Every person who, under color of any statute, ordinance,

regulation, custom, or usage, of any State or Territory or the

District of Columbia, subjects, or causes to be subjected, any citizen

of the United States or other person within the jurisdiction thereof

to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws, shall be liable to the party injured in

an action at law, suit in equity, or other proper proceeding for

redress."

96.    The Fourteenth Amendment to the United States Constitution states that "[n]o State shall… deprive any person of life, liberty, or property, without due process of law…" U.S. Const. amend. XIV, § 1.

97.    Bloomington deprived Carlton of his property interests without due process.

98.    Bloomington refused to provide Carlton with the evidence Bloomington intended to use in terminating him, refused to consider Carlton's exculpatory evidence, and silenced him while he tried to explain his side of the story in addition to being prevented from refuting evidence hid from him.

99.    The decision to terminate Carlton was made before the termination hearing. Simington, Wamsley and Williams knew there was evidence exonerating Carlton, the allegations against him were pretextual and through their words and

actions had made up their minds to terminate Carlton well before the termination hearing.

100.   As a direct and proximate cause of the aforementioned acts, Carlton suffered tangible and intangible losses.

WHEREFORE Plaintiff, Timmothy Carlton, respectfully requests that this Court enter judgment in his favor and against Defendant, the City of Bloomington, and grant the following relief:

A.   For appropriate compensatory damages to be determined at trial;

B.   Damages for emotional distress; and

C.   Attorney's fees, interest, costs and such further relief as the Court deems just and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Timmothy Carlton,
Plaintiff

By:   */s/ Julie L. Galassi*
    Julie L Galassi, Esq., Bar No. 6198035
    Bryant S. Lowe, Esq. Bar No. 6342267
    Hasselberg, Rock, Bell & Kuppler, LLP
    4600 N. Brandywine Drive, Suite 200
    Peoria, IL 61614-5591
    Telephone: (309) 688-9400
    Email:   jgalassi@hrbklaw.com
             blowe@hrbklaw.com